# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00152-CV

**State of Texas, Appellant**

v.

**Cottonwood Holdings, Ltd., A Texas Limited Partnership, Appellee**

### FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. 2393, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The State of Texas (State) appeals from a jury verdict awarding damages to Cottonwood Holdings, Ltd. (Cottonwood) for a parcel of land taken by condemnation and for damage to the remaining land as a result of the taking. The State contends that the trial court erred in restricting appraisal testimony to an economic unit of 39 acres or less and in excluding the use of Cottonwood's initial purchase of the land as a comparable sale for appraisal purposes. We affirm the judgment of the trial court.

## BACKGROUND

This is a condemnation case in which the State took 9.107 acres of a 109-acre piece of property owned by Cottonwood to make improvements to F.M. Road 973, which intersects with state highway 290 east of Austin. The condemnation occurred in June 2002. Cottonwood bought the 109-acre property and several other tracts of land three years before the condemnation with the

purpose of creating a master-planned community called "Shadowglen," which included commercial, residential, multi-family, and retail uses. A 70-acre portion of the 109 acres was subject to an option contract that gave Shadowglen Residential Community the exclusive right to purchase the 70-acre tract at a set price until the year 2021. The part taken by the State was a portion of the 39-acre tract of land not subject to the option contract.

After Cottonwood objected to the special commissioners' condemnation award, the case was set for trial. At a pre-trial hearing, the court ruled that the largest economic unit the parties could use for appraisal purposes was 39 acres, the remaining portion of the 109 acres that was not subject to the option contract. At the conclusion of trial, the jury awarded Cottonwood $250,862 as compensation for the part taken and $105,138 as damages to the remaining 30 acres. The trial court rendered judgment in accordance with the verdict.[1]

## DISCUSSION

The State appeals the trial court's judgment, arguing that the trial court erred in restricting the economic unit to a maximum of 39 acres and in excluding evidence of the initial sale of the 109-acre tract to Cottonwood in 1999. The State contends that the trial court's rulings resulted in an erroneous jury verdict regarding the amount of compensation due for the taking of Cottonwood's land. Compensation for land taken by eminent domain is measured by the fair-market value of the land at the time of taking. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex.

---

[1] The State deposited $91,070, the amount of the special commissioners' award, into the registry of the court on June 14, 2002, for the use and benefit of Cottonwood. Cottonwood withdrew this amount by order of the court. The judgment deducted the $91,070 from the total amount awarded by the jury for a net award of $264,930 plus pre-judgment and post-judgment interest and costs of court.

2

2002); *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Determination of fair-market value requires measuring the difference between the value of the land immediately before and immediately after the taking. *Exxon Pipeline*, 88 S.W.3d at 627; *Callejo v. Brazos Elec. Power Coop.*, *Inc.*, 755 S.W.2d 73, 76 (Tex. 1988). Market value is defined as the price the property would bring when offered for sale by one who desires to sell but is not obliged to do so and bought by one who desires to buy but is under no necessity to do so. *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992). In determining market value, the jury may consider all uses to which the property is reasonably adaptable and for which it is (or in all reasonable probability will become) available within the foreseeable future. *Id.*

When only part of the land is taken, the landowner is entitled to (1) the market value of the part taken and (2) the damage to the remainder as a result of the taking. *Id*. at 75-76. When the part taken can be considered an independent economic unit, the market value can be determined without reference to the remainder. *Id*. at 76. However, if the part taken cannot be considered an independent economic unit reflecting the highest and best use of the property, the market value must be determined by adding some portion or all of the remainder to construct an economic unit. *Id*.

**Admissibility of 109-acre tract as economic unit**

We first address the State's argument that the trial court erred in concluding as a matter of law that no more than 39 acres of the 109-acre tract could be used as an economic unit for determining market value. We review the trial court's conclusions of law *de novo*. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). Under *de novo* review, we exercise our own judgment, redetermine

3

each legal issue, and accord no deference to the trial court's conclusion. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

At a pre-trial hearing in this case, the trial court concluded that an economic unit of more than 39 acres of the 109-acre tract was inappropriate because the 70 acres subject to an option contract were not solely owned and controlled by Cottonwood. The State argues that the trial court erred because an optionee does not acquire any rights to the property until the option is exercised. However, at the time the option contract was formed, the optionee obtained an equitable interest with which it could legally prevent Cottonwood from selling the land. *See Goswami v. Metropolitan Sav. & Loan Ass'n*, 751 S.W.2d 487, 489 (Tex. 1988) (option contract gave optionee equitable interest in property and standing to contest validity of foreclosure sale); *Hitchcock Props., Inc. v. Levering*, 776 S.W.2d 236, 238 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (sale of option to purchase real estate constitutes sale of interest in land under Real Estate License Act because option gives optionee equitable interest in land). Because Cottonwood would have to obtain consent from the optionee in order to sell the entire 109-acre tract, Cottonwood could not be considered a willing seller for purposes of determining market value. Thus, the trial court properly restricted the economic unit to 39 acres or less.

The State contends that the trial court's determination of the size of the maximum economic unit violates the principles set forth by the supreme court in *Windham*. However, the facts in this case are distinguishable from those in *Windham*, and our ruling is consistent with that case. The dispute in *Windham* arose when the State and landowner disagreed as to the amount of remaining land to be added to the part taken in order to form an appropriate economic unit. While the landowner proposed a total of 3.84 acres in support of his theory that the highest and best use was

4

commercial development, the State sought to use the entire 19-acre parcel to support its contention that the highest and best use was to hold the land for investment purposes. The trial court restricted the appraisers' testimony to a 3.84-acre economic unit, thus preventing the State from presenting evidence in support of its theory of highest and best use. On appeal, the supreme court reversed the trial court and held that when the highest and best use of the land is disputed, a trial court must allow both parties to present evidence to the jury regarding their theory of highest and best use.

*Windham* is readily distinguishable from this case. Although the landowners there had ownership and control of the entire 19-acre tract, they asserted that they had a legal right to unilaterally carve out a 3.84-acre strip of land adjacent to a highway in order to support their proposed highest and best use, commercial development. Unlike the landowners in *Windham*, Cottonwood did not unilaterally designate a parcel of its land for use as an economic unit in order to suit its theory of highest and best use. Rather, the trial court made a legal determination that 70 acres of the 109-acre tract were not suitable for inclusion in an economic unit because they were not owned and controlled solely by Cottonwood. As a result, the trial court restricted the economic unit to a maximum of 39 acres, the entire remaining portion of land not burdened by the option contract. If Cottonwood had then argued that it had the right to designate the economic unit as only 12 of the 39 acres, this case would fall squarely within the realm of *Windham*. However, no such unilateral designation is present here. Rather, the trial court properly found that the size of the economic unit must be within the 39 acres controlled by Cottonwood.

This case is further distinguishable because *Windham* dealt specifically with the admissibility of both parties' economic units *when the highest and best use of the land was disputed*; the parties here advance the same theory of highest and best use for the 109-acre tract or the 39-acre

tract. In *Windham*, the parties disputed whether the highest and best use was to hold the land for investment or to use it for commercial development. In order to argue their respective theories, the parties each needed to use a different economic unit—19 acres for the State and 3.84 acres for the landowner. If the trial court restricted the economic unit to the size proposed by one party or the other, the opposing party would be forced to forfeit its theory of highest and best use. As a result, the supreme court held that both theories of highest and best use, and thus both proposed economic units, should be submitted to the jury.

However, in this case both parties agree that the highest and best use of the property is to hold it for real estate investment. The State's appraiser, David Oberrender, testified that the highest and best use of both the 109-acre and 39-acre parcels was to hold them as a real estate investment for future development of single-family homes, with potential commercial capabilities in the area facing F.M. 973. Similarly, Cottonwood felt that the highest and best use of the land was to hold it for investment, as evidenced by its purchase of the land to be included in a master-planned community containing single-family homes, apartments, retail facilities, a school, and a golf course. At the time of condemnation, Cottonwood had obtained approval of its plan from the City of Manor, had begun construction on the golf course and roads, and was in the process of obtaining agreements to receive utilities. Furthermore, the option contract on the 70-acre tract is evidence that Cottonwood purchased the land for investment purposes and that it actively sought developers to buy the land.

Nevertheless, the parties contend that they dispute highest and best use because they disagree as to how long it will take to develop real estate on the 39-acre tract and as to the feasibility of building multi-family as opposed to single-family homes. However, disputes about what type of residential facilities will eventually be built as one part of an expansive development and about the

6

approximate time-line in which that will occur do not constitute conflicting theories of highest and best use. Regardless of whether the property becomes apartment buildings, single-family homes, or a school, both the State and Cottonwood agree that the highest and best use, whatever the size of the economic unit, is to hold the property for real estate investment.

Further, this case is consistent with *Windham* because both parties were permitted to present their original theories of highest and best use to the jury. Unlike the circumstances in *Windham*, the trial court's restriction of the economic unit to no more than 39 acres in this case did not deprive the State of the opportunity to present its theory to the jury. Indeed, Oberrender testified for the State that his theory of highest and best use would be the same for the 39-acre and 109-acre tracts. For both tracts, Oberrender stated that the property should be held as a real estate investment for future development of single-family homes and for potential commercial use of the area facing F.M. 973. Thus, the trial court's ruling did not offend the principle set forth in *Windham* that the jury should decide between the parties' competing theories of highest and best use.

Because Cottonwood did not possess sole ownership and control of 70 acres of the 109-acre tract and because both parties advanced the same theory of highest and best use and were permitted to present their theories to the jury, we find that the trial court properly concluded as a matter of law that the 39-acre tract not subject to the option contract was the maximum economic unit the parties could use to determine market value.

**Admissibility of 1999 sale price**

The State also argues that the trial court erred in excluding evidence of the sale of the 109-acre tract to Cottonwood in 1999. We apply an abuse of discretion standard in reviewing a trial

7

court's decision to exclude evidence. *National Liab. and Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527-28 (Tex. 2000); *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 843 (Tex. App.—Austin 2004, no pet.). A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or without regard for any guiding rules or principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). A trial court's evidentiary ruling should be upheld if there is any legitimate basis for the ruling. *Owens-Corning*, 972 S.W.2d at 43. The party seeking reversal of a judgment based on a claimed error in excluding evidence must show that the error probably resulted in an improper judgment. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). We review the entire record when determining whether the claimed error probably resulted in an improper judgment. *Id*. A successful challenge to a trial court's exclusion of evidence typically requires the complaining party to show that the judgment turns on the excluded evidence. *Id*.

The State specifically contends that the 1999 sale of the 109-acre tract was relevant and probative to support Oberrender's testimony as to the market value of the property. Oberrender used the comparable sales method when determining his proposed market value of the land. When an appraiser uses a comparable sales analysis, he collects data for sales of property similar to the subject property and then makes upward or downward adjustments to the sale prices based on differences in the subject property. *Sharboneau*, 48 S.W.3d at 182. Comparable sales must (1) be voluntary, (2) take place near in time and place to the subject property, and (3) involve land with similar characteristics to the subject property. *Id*. The comparable sales method fails when the comparison is made to sales that are not actually comparable to the land condemned. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 808 (Tex. 2002). Determination of the degree of

similarity between the subject property and the land claimed to be a comparable sale is left largely to the discretion of the trial court. *State v. Childress*, 331 S.W.2d 230, 235 (Tex. Civ. App.—Eastland 1960, writ denied); *Board of Regents of Univ. of Tex. Sys. v. Puett*, 519 S.W.2d 667, 672 (Tex. Civ. App.—Austin 1975, writ denied). If the comparison between the subject property and another sale is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for the differences, the sale should not be admitted as a comparable sale. *Sharboneau*, 48 S.W.3d at 182.

Because Oberrender used the comparable sales approach to determine his proposed market value of the property, the 1999 sale is relevant to his testimony only if it is comparable to a sale of the same property at the time of the condemnation in 2002. However, Oberrender did not use the initial sale as a comparable sale in his market value analysis. He testified that he chose not to use the initial sale because Cottonwood had made many improvements to the property since its purchase in 1999. Considering that Oberrender deemed the sale too different from that of the current property to include it as a comparable sale, the trial court did not abuse its discretion in failing to admit the 1999 sales price.

Further, the record shows that Oberrender was not mistaken in finding that the land had changed considerably in the three years since its initial purchase. In 1999, the 109-acre tract was farmland, but by 2002 Cottonwood had obtained approval of its master-planned community from the City of Manor, arranged for utilities to be provided to the site, and had begun construction on the golf course and roads. Cottonwood's developer testified that approximately $35 million had been invested in the master-planned community at the time of trial, including approximately $12 million spent on the first phase of the project for roads and utilities necessary for lot development. In

addition, the purchase price of the property in 1999 was only $2,886 per acre, whereas Oberrender testified that his proposed market value for the part taken at the time of condemnation was $12,000 per acre using the 109-acre economic unit and $13,500 per acre using the 39-acre economic unit. Thus, according to Oberrender, the value of the 39-acre tract at the time of condemnation was more than four times the value of the property at the time of Cottonwood's initial purchase.

Considering the clear differences between the 1999 sale to Cottonwood and the status of the property at the time of condemnation, as well as the fact that Oberrender did not use the initial sale in his comparable sales analysis, we find that the trial court acted within its discretion in excluding evidence of the 1999 sale.

## CONCLUSION

Because the trial court properly disregarded land under an option contract in determining the maximum appropriate economic unit and did not abuse its discretion in excluding evidence of the 1999 sale of the property, we affirm the judgment.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   April 21, 2005