# IN THE SUPREME COURT OF TEXAS

No. 13-0337

PLAINSCAPITAL BANK, PETITIONER,

v.

WILLIAM MARTIN, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued September 18, 2014**

JUSTICE BOYD, joined by JUSTICE GUZMAN, dissenting.

I agree with the Court that section 51.003 of the Texas Property Code applies in this case. The Court acknowledges the section provides an offset when the foreclosure sales price is less than "the fair market value of the realty as of the date of the foreclosure sale," *ante* at ___ (citing TEX. PROP. CODE § 51.003(b)), but the Court concludes that the trial court properly denied an offset by relying on the price for which the property sold fifteen months after that date. Although I agree that section 51.003 permits the fact-finder to consider evidence relating to a "future sales price," it does so only to the extent that evidence is relevant to determining the property's fair market value as of the date of the foreclosure sale. I do not agree that, by allowing the fact-finder to consider evidence relating to a future sales price, the statute uses the term "fair market value" to mean something other than its commonly understood reference to the amount that a willing buyer would have paid a willing seller. Because the trial court in this case relied on a future sales price

without equating that price to the property's fair market value on the date of the foreclosure sale, I would affirm the court of appeals' judgment reversing and remanding the case to the trial court. I therefore respectfully dissent.

**A. Section 51.003 applies.**

Section 51.003 addresses situations in which "the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency." TEX. PROP CODE § 51.003(a). Although PlainsCapital Bank concedes that it conducted a foreclosure sale under section 51.002, and that the sales price was less than the amount of the secured debt, it contends that section 51.003 does not apply because it is not suing for "the deficiency" that section 51.003 describes. Noting that section 51.003 provides that it governs "any action brought to recover *the* deficiency," *id.* (emphasis added), PlainsCapital contends that the statute does not apply here because it is suing for the difference between the amount of the secured debt and the price for which it later actually sold the property ($599,000), not the price it paid for the property at the foreclosure sale ($539,000).

Based on the text and context of section 51.003, I agree with the Court that the statute applies whenever a lender who conducts a non-judicial foreclosure sale under section 51.002 later pursues an action to recover the deficiency resulting from the sale, regardless of whether the lender elects to apply some credit to that amount. *See Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 4 (Tex. 2014) (explaining that "a deficiency judgment is based on 'the amount of the note, interest and attorney's fees, less the amount received at the trustee sale and other legitimate credits'") (quoting *Tarrant Sav. Ass'n v. Lucky Homes, Inc.*, 390 S.W.2d 473, 475 (Tex. 1965)).

2

Section 51.003 expressly refers and relates to "a foreclosure sale under Section 51.002." TEX. PROP. CODE § 51.003(a). Section 51.002, in turn, governs "[a] sale of real property under a power of sale conferred by a deed of trust or other contract lien." *Id*. § 51.002(a). Sections 51.002 and 51.003 impose several mandatory requirements on such a sale,[1] and section 51.003 applies "[i]f the price at which [the] property is sold at [the] foreclosure sale . . . is less than the unpaid balance of the indebtedness secured . . . resulting in a deficiency." *Id*. § 51.003(a).

In context, I read section 51.003 to contemplate that only one "deficiency" can result from a foreclosure sale under section 51.002, and that any subsequent claim to recover the remaining amount of the debt is necessarily a claim for that deficiency. That is not to say that the only amount that section 51.003 permits a lender to recover is the difference between the secured debt and the foreclosure sales price. To the contrary, the statute expressly provides for credits and offsets that will alter the amount of the deficiency. Section 51.003(d), for example, provides that "[a]ny money received by a lender from a private mortgage guaranty insurer shall be credited to the account of the borrower prior to the lender bringing an action at law for any deficiency owed by the borrower." And more importantly here, section 51.003(c) requires "an offset against the deficiency" if the property's fair market value at the time of the foreclosure sale exceeded the foreclosure sales price.

---

[1] For example, section 51.002 requires that such a sale "must be a public sale at auction" held at a specific time on a specific day of each month and at a specific location. *Id*. § 51.002(a). Before conducting such a sale, the lender must provide specific notices to the public and to the debtor and must give the debtor an opportunity to cure the default. *Id*. § 51.002(b), (d). Although sections 51.002 and 51.003 do not affect certain kinds of liens, including those "arising under common law, in equity, or under another statute of this state," *id*. § 51.001(2), they otherwise apply to any "sale of real property under a power of sale conferred by a deed of trust or other contract lien," and their requirements are mandatory as to such a sale. *Id*. § 51.002(a) (requiring that sale "must" be a public sale at auction and "must" be held on at a certain time and date and at a certain location); *see also id.* §§ 51.002(b), (d), (i) (notice "must" be given by a certain date using certain methods and "must" include certain statements); 51.003(a) (suit for deficiency "must" be brought within two years); 51.003(d) (money received from insurer "shall" be credited to borrower's account).

3

Here, the statute allowed PlainsCapital to sue William Martin for the difference between the amount of the debt and the foreclosure sales price ($539,000.00), and the statute permitted Martin to seek an offset in the amount by which the property's fair market value on the date of the foreclosure exceeded the foreclosure sales price. But PlainsCapital chose instead to sue for a lower amount, which was the difference between the amount of the debt and the price for which PlainsCapital sold the property fifteen months after the foreclosure sale ($599,000.00). In effect, PlainsCapital attempted to provide a different kind of offset, in the amount of the difference between the subsequent sale price and the foreclosure sales price. But the statute already accommodates consideration of the subsequent sale price—or more specifically, "the necessity and amount of any discount to be applied to the future sales price"—as evidence to consider when determining the offset based on the property's fair market value at the time of the foreclosure sale. *Id.* § 51.003(b)(5). The statute does not permit the lender to provide an offset based on a "future sales price" and thereby avoid the statute's mandatory requirements any more than it permits the lender to avoid the statute by providing a gratuitous offset of $1, $1,000, or any other arbitrary amount. Under the statute, the "future sales price" on which PlainsCapital sought to rely is relevant only to the determination of the property's fair market value at the time of the foreclosure sale, and unless "competent evidence of fair market value is introduced, the sale price at the foreclosure sale *shall* be used to compute *the deficiency*." *Id.* § 51.003(c) (emphases added).

Although PlainsCapital contends that it merely sought to benefit the borrower by relying on the future sales price rather than the fair market value to compute the amount of the deficiency, the statute neither contemplates nor permits such an approach. Because section 51.003 applies whenever a lender sues to collect a deficiency following a foreclosure sale under section 51.002

4

and imposes specific, mandatory requirements to govern such a suit, I agree with the Court that section 51.003 applies to PlainsCapital's claim in this case.

**B.      The Meaning of "Fair Market Value"**

Although the Court acknowledges that the statute provides an offset based on "the fair market value of the realty as of the date of the foreclosure sale," *ante* at ___ (citing TEX. PROP. CODE § 51.003(b)), the Court refuses to equate "'fair market value' as that term is used in § 51.003 with the historic measure of fair market value." *Ante* at ___.[2] Although the Court acknowledges that "we would ordinarily presume the common meaning of the term applies," *ante* at ___, it concludes that "fair market value" cannot have the common willing-seller/willing-buyer meaning here because the statute allows the fact-finder to consider "forward looking" evidence that is not commonly considered to determine "fair market value." *Ante* at ___. Specifically, because the statute allows the fact-finder to consider evidence of "the necessity and amount of any discount to be applied to the future sales price," the Court concludes that "the term 'fair market value' in § 51.003 does not equate precisely to the common, or historical, definition." *Ante* at ___. Instead, according to the Court, the term "fair market value" means "the historical definition as modified by evidence § 51.003(b) authorizes the trial court to consider in its discretion, to the extent such evidence is not subsumed in the historical definition." *Ante* at ___.

The Court's reasoning on this point is not clear to me. The Court agrees that the statute requires the trial court to "calculat[e] the fair market value as of the date of the foreclosure sale,"

---

[2] The familiar "historic measure" is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Ante* at ___ (quoting *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001)).

*ante* at \_\_\_, yet the Court holds that the statute permitted the trial court to rely on a future sales price, even though no evidence tied that price to the property's fair market value on the date of the foreclosure sale fifteen months earlier. *Ante* at \_\_\_. The Court thus apparently concludes that the statute creates an either/or proposition, such that it allows the fact-finder to determine the offset by deducting the foreclosure sales price from *either* the historical "fair market value as of the date of the foreclosure sale" *or* the "future sales price." *Ante* at\_\_\_. But the statute refers to the future sales price as "[c]ompetent evidence of value" by which "[t]he fair market value shall be determined," not as an independent alternative to the fair market value. TEX. PROP. CODE § 51.003(b). Section 51.003 thus permits the fact-finder to consider a future sales price, but only as evidence of the property's willing-seller/willing-buyer value on the date of the foreclosure sale.

By permitting the court to consider evidence that is not typically relevant to a fair-market-value analysis, the statute simply reflects the nature of foreclosure sales,[3] not a new meaning of "fair market value." The statute expressly requires that the court determine "the fair market value of the real property as of the date of the foreclosure sale," and the evidence regarding the discounted future sales price is permissible only to "arrive at a current fair market value" on that date. TEX. PROP. CODE § 51.003(b)(5).

---

[3] Specifically, the statute reflects the reality that lenders and other parties who purchase property at a foreclosure sale often intend to sell the property soon thereafter. Because the purpose of foreclosure is to preserve the debt's security by removing it from the party who cannot afford it, "[i]t is the law in Texas that a court may take judicial notice that property is worth more at a private, arms-length sale than at a forced sale under a deed of trust." *Alamo Lumber Co. v. Gold*, 661 S.W.2d 926, 932 (Tex. 1983). The buyer at foreclosure, who typically pays below market value because of the dearth of competitive bids, *see, e.g.*, C. Averch & M. Collins, *Avoidance of Foreclosure Sales as Preferential Transfers: Another Serious Threat to Secured Creditors?*, 24 TEX. TECH L. REV. 985, 990 (1993), typically attempts to recoup its money by reselling the property for at or above market value. In such circumstances, the price for which the property is likely to sell, or in fact has since sold, after the foreclosure sale may assist the fact-finder in determining the property's fair market value on the date of the foreclosure sale. But it does not itself constitute the fair market value on that date.

## C.  "Discounting" the Future Sales Price

Although the statute refers to a "future sales price," it does so using terms that necessarily tie that price to the property's fair market value on the date of the foreclosure sale. Specifically, the statute provides that "[c]ompetent evidence" of the property's fair market value "may include" evidence of "the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value." *Id.*[4] The statute thus permits the fact-finder to consider "the future sales price" only within the context of evidence regarding "the necessity and amount of any discount to be applied to [that price] . . . to arrive at a current fair market value." I thus disagree with the Court's conclusions that "the trial court did not abuse its discretion by calculating the property's fair market value using the $599,000 future sales price [and] not applying a discount to reduce the price further,"[5] *ante* at ___, and that the statute "permitted, but did not require" the trial court to apply a discount to the $599,000 future sales price. *Ante* at ___. The statute did not "require" the trial court to consider the future sales price at all, but because it did, the statute required the trial court to consider that price only with evidence

---

[4] The statute's reference to "the cashflow generated by the property" further confirms this point. *Id.* Section 51.003(b)(5) expressly authorizes evidence of "the necessity and amount of any discount to be applied" not only to "the future sales price," but also to "the cashflow generated by the property," as necessary "to arrive at a current fair market value." Similar to the "classic income approach," *see Estate of Sharboneau*, 48 S.W.3d at 183, and our "nuanced approach" to the "subdivision development method," *id.* at 186, the statute's approval of the "discounted cashflow method" in the foreclosure context acknowledges that the amount of money that a buyer at the foreclosure sale will generate from the property in the future may be relevant to the determination of the property's current fair market value. "No matter what appraisal method an expert uses, however, the goal of the inquiry is always to find the fair market value," and "[a]n appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller." *Id.* at 183. Thus, evidence of future cashflow, like evidence of a future sales price, is relevant only if the amount is adjusted "to arrive at a current fair market value." TEX. PROP. CODE § 51.003(b)(5).

[5] For the reasons the Court explains, I agree with its conclusion that the trial court did not abuse its discretion by "deducting PlainsCapital's actual holding costs of $75,376.41 and actual sales costs of $45,907.04." *Ante* at ___.

of "the necessity and amount of any discount to be applied" to that price "to arrive at a current fair market value." TEX. PROP CODE § 51.003(b)(5).

We have often recognized that, for purposes of calculating damages, the amount of any future payment must be discounted to reflect its present-day value. *See*, *e.g.*, *Sheshunoff & Co. v. Scholl*, 564 S.W.2d 697, 698 (Tex. 1978) (holding that an award of future salary payments "should have been discounted to its present value at the legal rate of interest"); *Republic Bankers Life Ins. Co. v. Jaeger*, 551 S.W.2d 30, 31 (Tex. 1976) (holding that the proper measure of damages was "the present value of all unaccrued payments that the plaintiff would have received if the contract had been performed"); *Pollack v. Pollack*, 39 S.W.2d 853, 858 (Tex. Comm'n App. 1931) (holding that, "[i]n computing the present worth of such future payments, same should have been discounted to their present worth at the date of judgment at 6 per cent. interest per annum"). As we explained in *Jaeger*, discounting future damages to their present value "gives the breaching party the benefit of the earning power of his money," and the "proper measure of damages" is thus "a sum which, if invested at a reasonable rate of interest, will yield an annual income from both principal and interest, . . . equal to" the amount the plaintiff would have received. 551 S.W.2d at 31. Thus, "[t]he amount actually awarded will be less than the sum of all future payments because it includes a discount which approximates the earning capacity of [the payor's] money." *Id*.

Section 51.003(b)(5) acknowledges and incorporates a similar principle to determine fair market value in the foreclosure context. Since the statute's goal is to determine the property's value "as of the date of the foreclosure sale," section 51.003(b)(5) does not simply state that the fact-finder may consider evidence of "the future sales price." Rather, it states that the fact-finder may consider evidence of "*the necessity and amount of any discount* to be applied to the future sales

8

price." TEX. PROP. CODE § 51.003(b)(5) (emphasis added). Thus, if a court relies on evidence of a "future sales price," it must make adjustments to that price as necessary "to arrive at a current fair market value" as of the date of the foreclosure sale. *Id*. The future sales price is relevant only to the extent it leads the fact-finder to that amount.

In this case, the trial court did not consider evidence of the necessity or amount of any discount to convert the $599,000 future sales price into the property's fair market value on the date of the foreclosure sale. Some evidence indicated that the fair market value at the time of foreclosure was substantially greater than the $539,000 that PlainsCapital paid, even as high as $825,000 or $850,000.[6] If, in fact, the property was worth a greater amount on the date of foreclosure but subsequently lost substantial value due to a decline in the market, the statute nevertheless required the court to determine the offset based on the property's fair market value on the date of the foreclosure sale, not its value fifteen months later. Thus, if the court elected to rely on the subsequent sale price, rather than on the other testimony regarding the property's fair market value, the statute required the court to consider any discount or market decline to equate the subsequent sale price to the fair market value on the date of the foreclosure sale. For this reason, I disagree with the Court's assertion that, "if we were to rule the future sales price competent evidence, but only upon a showing of comparable market conditions between the time of the foreclosure sale

---

[6] Martin presented the testimony of two expert appraisers who concluded that the property's fair market value at the time of foreclosure was $825,000, while Martin testified to his opinion as the property's owner that it was worth $850,000. PlainsCapital's own witness testified that PlainsCapital was prepared to pay up to around $787,000 if other bidders had competed at the foreclosure sale. Shortly before the foreclosure sale, PlainsCapital's broker estimated that the property's "as is" market value was $770,000 and suggested a "list price" of $799,000, but noted that the "normal marketing time in the area" was 273 days. PlainsCapital determined its $539,000 foreclosure bid price by reducing the $770,000 market value 30% to reflect the fact that the home had been foreclosed on and would be sold without a warranty, and to accommodate for the holding and transaction costs that it would incur to effectuate a subsequent sale.

and the time of the future sale, we would be adding words to § 51.003." *Ante* at ___. The statute focuses solely on the fair market value on the date of the foreclosure sale, so the future sales price is "competent evidence" of that value only if other evidence permits the fact-finder to adjust that price to result in the property's "current market value" on that date.

Here, as the Court notes, the trial court excluded PlainsCapital's evidence of a discount rate to apply to the future sales price, and if the trial court had applied that discount "the result would have been a lesser number for the § 51.003 fair market value finding than the $477,715.65 figure the trial court found, and Martin still would not have been entitled to an offset." *Ante* at ___. But the statute did not permit the trial court to simply rely on the future sales price and subtract holding and sales costs without considering whether and how the future sales price actually established the property's value on the date of the foreclosure sale. As a result, no evidence supports the trial court's conclusion that the property was worth the amount for which it sold fifteen months later. I thus disagree with the Court's holding that the evidence was "legally sufficient to support the trial court's finding that the fair market value of the property . . . for § 51.003 purposes was $477,715.65." *Ante* at ___.

In summary, although I agree that section 51.003 applies here and permitted the trial court to consider the property's future sales price, I would hold that the statute required the court to base the amount of the offset only on the property's willing-seller/willing-buyer fair market value as of the date of the foreclosure sale, and permitted the court to consider the future sales price only as evidence leading to the determination of that value. I would therefore affirm the court of appeals' judgment remanding this case to the trial court, and instruct the court that it may consider the

10

$599,000 future sales price only if other evidence enables the court to convert that price into the property's current fair market value as of the date of the foreclosure sale.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: March 27, 2015

11