Opinion filed January 18, 2007




















 
 
  
 
 







 
 
  
 
 




Opinion filed January 18, 2007

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00062-CV 

                                                     __________

 

                            CITY
OF SUGAR LAND, TEXAS, Appellant

 

                                                             V.

 

                    HOME
AND HEARTH SUGARLAND, L.P., Appellee

 



 

                                  On
Appeal from the County Court at Law No. 1

 

                                                      Fort Bend County, Texas

 

                                                   Trial
Court Cause No. 17,485

 



 

                                                                   O
P I N I O N 








This is an appeal in an eminent domain
proceeding.  Home and Hearth Sugarland,
L.P.  (Home and Hearth) owned a tract of
land in the City of Sugar Land, Texas.[1]  The City instituted condemnation proceedings
in which it acquired the entire interest of Home and Hearth as to a portion of
the property as well as a drainage easement across another portion of the
property.  Home and Hearth owned a hotel
that was located on the remainder of the property, and the City did not seek
any interest in that property.  Special
Commissioners awarded Home and Hearth $552,651 for the taking. 

Home and Hearth appealed the award to the County
Court at Law No. 1.  The case was tried to
a jury, and the trial court entered a judgment in accordance with the
verdict.  Because Home and Hearth had
withdrawn the amount of the Commissioners=
award, the trial court credited its judgment for $552,651 and awarded Home and
Hearth $1,529,316.50 plus prejudgment interest of $231,322.50.  We affirm.

Background Facts

On May 1, 1998, Home and Hearth purchased a
5.9873-acre tract of land located near the intersection of U.S. Highway 90-A and U.S. Highway 59 in Sugar Land, Texas.[2]  On June 19, 1998, Home and Hearth obtained a
building permit for the construction of a hotel.  Home and Hearth constructed a
three-story,  extended-stay hotel on
approximately 3 acres of the interior portion of the 5.9873-acre tract, leaving
a 1.7709-acre tract to the north of the hotel site (fee area) and a 1.056-acre
tract to the south of the hotel site.  As
required by the City, Home and Hearth constructed a detention pond on
approximately .7 acres on the eastern portion of the 1.7709-acre tract. 

            The City filed condemnation proceedings by which it sought
to take fee simple title to the 1.7709-acre tract in order to construct a
regional detention pond.  The
construction plan for the regional detention pond incorporated the .7-acre
detention facility already built by Home and Hearth.  Home and Hearth had built the on-site
detention pond in order to meet drainage requirements for obtaining a building
permit.  One month after Home and Hearth
obtained the building permit, the City adopted Ordinance No. 1129 which changed
the detention requirements for undeveloped property where Home and Hearth was
located.  The ordinance provided that a
property owner could elect to pay an impact fee of $16,000 per acre instead of
providing on-site detention in order to obtain a building permit.








The City also sought a drainage easement across
the 1.056-acre tract.  The amount awarded
for this taking is not involved in this appeal. 
The City did not seek to condemn any interest in the property upon which
the hotel was located.  However, Home and
Hearth claimed that, in addition to damages for the taking of the 1.7709-acre
tract and for the taking of the easement, the City owed it for damages to the
hotel property that occurred as a result of that taking.

The Appeal from the Commissioners= Award

After the appeal from the Commissioners= award, the case initially went to
trial in November 2001.  During the
trial, the City moved for a trial amendment that would allow Home and Hearth
drainage rights for the hotel property that was not taken.  The trial court allowed the City to amend its
pleadings in order to grant drainage rights for the hotel portion of the
property but refused to allow a trial amendment as to Home and Hearth=s other undeveloped tract not taken by
the City.  Home and Hearth moved for a
mistrial, and the trial court granted the motion.

On April 12, 2004, the City filed its AFirst Amended Petition and Statement in
Condemnation.@  At a later hearing, the City stipulated that
Home and Hearth could drain its undeveloped property into the proposed regional
detention pond at no cost to Home and Hearth. Together, the amended petition
and the stipulation allowed Home and Hearth to drain the entire remainder into
the regional detention facility.  

In July 2004, the case was presented to a jury,
and the jury returned its verdict that on the date of the taking, January 13,
2000:  (1) the market value of the
1.7709-acre fee area  (77,142-square
feet) taken by the City was $14.75 per square foot; (2) the difference in the
market value of the 0.0169 acres (736-square feet across the 1.056-acre tract)
immediately before and immediately after the taking was $1,472; and (3) the
difference in the market value of the remainder immediately before and
immediately after the taking was $390,000.[3]

The trial court denied the City=s motion for judgment notwithstanding
the verdict, and it entered a final judgment on the jury verdict.  Subsequently, the trial court denied the City=s motion to modify and its motion for
new trial. 

The Issues








The primary issues in this case relate to the fair
market value of the 1.7709-acre fee area and to the amount awarded for damages
to the remainder as a result of the taking of the fee area.  In this appeal, the City attacks the
admissibility of the testimony of Home and Hearth=s
two expert witnesses, Vernon Henry and Matthew C. Deal.  The City also contends that the trial court
reversibly erred when it denied the City=s
request for a judgment notwithstanding the verdict because, without Henry=s testimony and without Deal=s testimony, the evidence was legally
insufficient to support the jury=s
finding on the market value of the fee area taken as well as its finding
regarding damages to the remainder resulting from the taking.  The City also complains that the trial court
abused its discretion when it denied the City=s
requested jury instructions.

Admissibility of Expert Testimony Generally

Under Tex.
R. Evid. 702, in order for an expert=s
testimony to be admissible, the expert must be qualified, and the expert=s opinion must be relevant to the
issues in the case and must be based upon a reliable foundation.  Guadalupe-Blanco River Auth. v. Kraft,
77 S.W.3d 805, 807 (Tex. 2002) (applying the
relevancy and reliability requirements of Rule 702 to testimony of expert
appraisal witnesses in condemnation actions); Gammill v. Jack Williams
Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998). 
The trial court acts as an evidentiary gatekeeper to screen irrelevant
and unreliable expert evidence.  Exxon Pipeline Co. v. Zwahr, 88
S.W.3d 623, 629 (Tex.
2002).  A trial court has broad
discretion to determine the admissibility of evidence, and the appellate court
will reverse only if that discretion has been abused.  A trial court abuses its discretion if it
acts without reference to any guiding principles.
 E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). 

The reliability requirement under Rule 702 focuses
on the basis of the expert=s
opinion B   Athe
principles, research, and methodology underlying an expert=s conclusions.@  Zwahr, 88 S.W.3d at 629 (citing
Robinson, 923 S.W.2d at 557).  Expert testimony is unreliable if it is no
more than Asubjective
belief or unsupported speculation.@
Id. (citing Daubert v. Merrell Dow
Pharms., Inc., 509 U.S.
579, 590 (1993)).  Expert testimony is
also unreliable if the court concludes that Athere
is simply too great an analytical gap between the data and the opinion
proffered.@ Gammill,
972 S.W.2d at 726 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136
(1997)).  

In reviewing the reliability of expert testimony,
the trial court is not to determine whether the expert=s
conclusions are correct; rather, the court should determine only whether the
analysis used to reach those conclusions is reliable.  Zwahr, 88 S.W.3d at 629 (citing Gammill, 972 S.W.2d at 728).  Moreover, reliability is an issue of
admissibility for the trial court, not a weight-of-the-evidence issue for the
fact-finder.  See Gen. Motors Corp. v. Sanchez,
997 S.W.2d 584, 590 (Tex.
1999). 

                                                                       Fee
Area

The Testimony of Matthew C. Deal

The City asserts that the trial court erred in
admitting the testimony of Home and Hearth=s
expert witness, Deal, on the issue of the fair market value of the fee
area.  We will discuss Deal=s testimony on other issues later in
this opinion.  The City argues that Deal=s testimony was unreliable because his
determination of the highest and best use for the fee area was flawed.[4]

Compensation for land taken by eminent domain is
measured by the fair-market value of the land at the time of taking.  Zwahr, 88 S.W.3d at 627; City of Harlingen v. Estate of Sharboneau, 48 S.W.3d 177, 182
(Tex.
2001).  Market value is defined as the
price the property would bring when offered for sale by one who desires to sell
but is not obliged to do so and bought by one who desires to buy but is under
no necessity to do so.  Sharboneau,
48 S.W.3d at 182, 189 (citing State v. Carpenter, 89 S.W.2d 979, 979 (Tex. 1936); State v. Windham,
837 S.W.2d 73, 77 (Tex.
1992)).  In determining market value, the
jury may consider all uses for which the property is reasonably adaptable and
for which it is (or in all reasonable probability will become) available within
the foreseeable future. Id.


The highest and best use is defined as A[t]he reasonably probable and legal use
of vacant land or an improved property, which is physically possible,
appropriately supported, financially feasible, and that results in the highest
value.@  Appraisal
Institute, The Appraisal Of Real Estate 269 (9th ed. 1987).  The four factors to be used in determining
the highest and best use are legal permissibility, physical possibility,
financial feasibility, and maximal productivity.  Id.
307-08. In determining the highest and best use of property, consideration must
be given to Aall of
the uses to which the property is reasonably adaptable and for which it is, or
in all reasonable probability will become, available within the foreseeable
future.@  Windham,
837 S.W.2d at 77.  Consideration
cannot be given to uses which are purely speculative and unavailable.  City of Austin
v. Cannizzo, 267 S.W.2d 808, 814 (Tex.
1954). 








Deal testified that the highest and best use of
the 1.7709 acres being acquired by the City, which is zoned for commercial use,
was for commercial purposes, specifically a restaurant.  The City does not disagree that the site in
question was zoned for commercial purposes or that a restaurant could be built
there.  Instead, it argues that Deal made
no effort to determine whether Home and Hearth would be able to use the entire fee
area for commercial purposes within a reasonable time in the future.  It is the City=s
position on appeal that the .7 of an acre previously used for a detention pond
could not be used for a restaurant or other purposes and that, therefore, Deal=s determination of the highest and best
use was flawed and his opinion was neither relevant nor reliable.  

It is undisputed that the fee area was not being
used for restaurant purposes at the time of the taking.  When property is being valued for purposes
other than that for which the property is being used at the time of the taking,
before testimony is admissible as to the value for those purposes, it must be
shown that the other use is one for which the property is adaptable, that such
use is reasonably probable within a reasonable time or the immediate future,
and that such use enhances the market value of the property.  Sw. Bell Tel. Co. v. Radler Pavilion Ltd.
P=ship,
77 S.W.3d 482, 486 (Tex. App.CHouston
[1st Dist.] 2002, pet. denied).

The record shows that several hotels in the
vicinity had adjacent restaurants.  Deal
testified that the property was reasonably adaptable in the near future for a
fast-food restaurant and that such use would enhance the value of the hotel
property.  Deal testified that building a
restaurant would have occurred within the reasonable future but for the
taking.  Deal further testified that the
proposed use was legally permissible, physically possible, financially feasible,
and maximally productive.

In arriving at the fair market value of property
made the subject of condemnation proceedings, the preferred approach is to
utilize comparable sales.  Sharboneau,
48 S.W.3d at 182. A determination of the highest and best use of property
facilitates the location and use of comparable sales in establishing the fair
market value of the property.  Appraisal Institute, The Appraisal Of Real
Estate 270, 274 (9th ed. 1987). 








Deal arrived at the opinion that the fair market
value of the fee area was $17.50 per square foot.  To reach his conclusion, after determining
the highest and best use of the fee area, Deal used four  comparable sales in the vicinity of Home and
Hearth.  Those sales ranged in price from
$13.50 per square foot to $18.59 per square foot with the respective acreage
ranging from 1.0125 acres to 2.1159 acres.  
All of the comparable sales occurred within five years of the date of
the taking in this case.

One of the comparable sales used by Deal included
a 2.1159-acre tract.  The buyer of that
tract paid $16.27 per square foot for the property even though it had no
detention pond and even though drainage issues would have to be addressed.  Ordinance No. 1129, adopted by the City on
July 21, 1998, approximately one month after Home and Hearth obtained a permit
to build a hotel, required that property owners in the area bounded by U.S.
Highway 59 and U.S. Highway 90-A Amake
use of the Regional Drainage Facilities by participating in the payment of the
cost of the facilities as an alternative to providing onsite detention
facilities.@

In the Awilling
seller B willing
buyer test@ of
market value,  all factors should be
considered that would reasonably be given weight in negotiations between a
seller and a buyer.  Radler Pavilion,
77 S.W.3d at 485-86 (citing Cannizzo, 267 S.W.2d at 814).  The testimony shows that a buyer would
consider drainage issues in acquiring the 1.7709-acre site B either to provide for onsite detention
or pay the fee to use the proposed regional facility.  The fact that the 1.7709-acre site already
had a detention site would be a factor to consider in negotiations between a
willing buyer and willing seller in settling on the fair market value.

The Testimony of Edward Shulz

Edward Schulz, an expert witness for the City,
testified that the 1.7709 acres taken by the City, which fronts U.S. Highway 90-A,
had a different price per square foot than the 1.056-acre tract, which fronts
U.S. Highway 59.  There was no claim that
the .7 of an acre constituted an economic unit apart from the other property in
the fee area.  An economic unit is a
portion of property that is economically self-sufficient to support the highest
and best use independent of the remaining portions of the whole property.  See Zwahr, 88 S.W.3d at 628.  Schulz testified that the price difference
was attributable to the different locations and not to the detention pond or to
any other difference in the conditions of either tract.  Schulz valued the entire fee area at $7.50
per square foot without differentiation relating to the .7 of an acre detention
pond. 








We hold that Deal=s
testimony regarding the fair market value of the fee area was both relevant and
reliable and that the trial court did not abuse its discretion when it admitted
the testimony.  The City=s issues on appeal pertaining to
testimony of the value of the fee area are overruled. 

                                                             The
Remainder Tract

The Testimony of Vernon Henry

Home and Hearth called Vernon Henry to testify as
an expert regarding drainage and safety issues. 
The City argues that the trial court erred in allowing Henry to testify
as an expert for Home and Hearth because he was not qualified to testify on
those issues, Aand his
opinions and testimony on such matters in this case thus were wholly
unreliable.@  In deciding whether an expert is qualified,
the trial court must ensure that the purported expert truly has expertise
concerning the actual subject about which the expert is offering the
opinion.  Gammill, 972 S.W.2d at
719. 

The record reflects that Henry was a land planner,
that he was president of his own land planning firm (established in 1967), and
that he had over 40 years experience with planning.  Henry had two degrees in the architectural
and design field and had taken graduate courses in planning at a number of
universities.  For the past fifteen
years, Henry had dealt with detention and drainage issues as an expert advisor
for developers.  As part of Henry=s job and experience as a land planner,
he was required to evaluate risk of harm and safety issues pertaining to
detention ponds.  That he did not design
detention ponds and that he had not written articles on safety and was not a
licensed engineer does not mean Henry was not qualified to testify on safety
and drainage issues.

 Among other
information, Henry reviewed the plans of the City=s
proposed regional detention pond, the existing detention pond on Home and
Hearth=s
property, depositions of various witnesses, the manner in which other detention
facilities in the area were constructed, and the issues addressed by other
developers in relation to detention, including safety.  After evaluating the design of the City=s proposed regional detention facility,
Henry testified that it would be more appropriate if the detention pond were to
have a more gradual slope, that the area would be safer with a fence around the
remaining property, and that a safety ledge should be installed in the
detention pond.[5]








The record reflects that Henry was qualified.  We further hold that Henry=s testimony as to the safety and
drainage issues was relevant and reliable under Rule 702.[6]  Zwahr, 88 S.W.3d at 629 (citing
Robinson, 923 S.W.2d at 556); Sharboneau, 48 S.W.3d at 186.  The trial court did not abuse its discretion
when it admitted Henry=s
testimony about those issues.

The Testimony of Matthew C. Deal

The City=s
raises several issues in connection with Deal=s
opinion regarding the damages to the remainder property which resulted from a
taking of the fee area.  These issues may
be grouped into two general categories: 
(1) improper application of the cost-to-cure doctrine and (2) improper
assessment of other damages to the hotel property.

Cost to Cure

Home and Hearth presented evidence that the
construction of the regional detention pond on the fee area created a safety
risk to that portion of the remainder property upon which the hotel was
located.  The testimony showed that the
risks could be reduced by redesigning the measurements of the pond, by adding a
ledge around the pond, or by constructing a fence between the hotel tract and
the detention pond.  According to Home
and Hearth=s
evidence, it would cost $528,080 to construct the fence.  It would be necessary to construct a portion
of the fence upon property owned by a third party. 

The City complains that the evidence regarding the
cost of the fence was not admissible because it did not meet the foundational
requirements for the introduction of Acost
to cure@ evidence
in condemnation cases.  ACost-to-cure@
cases are those in which the condemnor seeks to prove that any diminution in
the market value of a remainder resulting from a partial taking can be cured at
a cost less than the diminution.  The
method is Anever
used except as a method of decreasing the amount of severance damages which
would be due under the before and after rule,@
and this is not a Acost-to-cure@ case. 
4A Julius L. Sackman, Nichols On
Eminent Domain ' 14A.04[2], at 14A-99 (rev. 3ed.
2001).  The City=s
issues regarding cost to cure are overruled.








When only a part of a tract is taken, as here, the
landowner is entitled to (1) the fair market value of the part taken and (2)
any damage to the remainder as a result of the taking.  Zwahr, 88 S.W.3d at 627; State v.
Carpenter, 89 S.W.2d 194, 199 (Tex.
1936).  Determination of the fair market
value of remainder property requires measuring the difference between the value
of the property immediately before and immediately after the taking.  Zwahr, 88 S.W.3d at 627; Callejo v.
Brazos Elec. Power Coop., Inc., 755 S.W.2d 73, 76 (Tex. 1988). 
It was Home and Hearth=s
burden to establish the fair market value of the property.  Religious of the Sacred Heart of Tex. v. City of Houston, 836
S.W.2d 606, 613 (Tex.
1992). 

The cost of the fence was admissible, not as a
separate element of damage, but as information that could be used by the jury
to arrive at the diminished value of the remainder tract after the taking, if
any.  As the Texas Supreme Court
explained in Carpenter, 89 S.W.2d at 199-200.

[T]he
parties would have the right to introduce evidence of everything that would
tend to affect the value of the land, in the estimation of a proposed
purchaser, or that would tend to make it more or less valuable to the present
owner, such as the shape in which the tract will be left; the increased amount
of fencing, if any, that will be required; the increased expenditures made
necessary to provide water. . . . But this evidence is introduced, not as
constituting the measure of damages, but as elements to enable the jury to
arrive at the correct measure, which, as above stated, is the lessened value of
the tract, if any, caused by these different elements, when all are taken into
consideration.

 

.
. . .

 

.
. .These elements of damage and value are neither the measure of damages, nor
are they allowed as specific items of damage. 
They go to the jury only to throw light on the general question of
depreciation.

 

.
. . . 

 

.
. .[I]t is proper as touching the matter of the value and depreciation in value
to admit evidence upon all such matters as suitability and adaptability,
surroundings, conditions before and after, and all circumstances which tend to
increase or diminish  the present market
value. 

 

Deal=s
testimony regarding the value of the remainder before and after the taking was
admissible.  See Holiday Inns, Inc. v.
State, 931 S.W.2d 614 (Tex. App.CAmarillo
1996, writ denied).  The trial court did
not err when it admitted Deal=s
testimony.








Deal=s
Other Testimony on Before and After Values of the Remainder Property

In their last issue with respect to Deal=s testimony, the City asserts that Deal=s testimony regarding a 10% diminution
in the value of the hotel site was flawed because Deal failed to employ the
proper methodology in establishing the value of the remainder tract before the
taking. 

The City argues that Deal should have used the
comparable sales approach instead of the cost 
and income approaches in valuing the hotel site prior to the
taking.  It is true that the preferred
method for arriving at market value is the comparable sales method. Sharboneau,
48 S.W.3d at 183.  However, A[w]hen comparable sales figures are
lacking or the method is otherwise inadequate as a measure of fair market
value, courts have accepted testimony based on the cost approach and the income
approach.@ Id. 

In order to calculate the diminution to the value
of the hotel, Deal used the cost approach to support his damage model and then
used the income approach as a method of comparison.  Whether to allow testimony as to the cost approach
in order to determine the fair market value of real property is a function of
the trial court as the gatekeeper.  See
Rule 702; Sharboneau, 48 S.W.3d at 183. 
The cost approach looks to the cost of replacing the improved property
while taking depreciation into account. 
That method is appropriate for assessing the value of improved property
that is unique in character and not frequently exchanged in the
marketplace.  Religious of the Sacred
Heart, 836 S.W.2d at 616.  The income
approach is appropriate when the property, in the open market, would be priced
according to the income it already generates. Sharboneau, 48 S.W.3d at
183.  No matter which appraisal method an
expert uses, the goal is always to find the fair market value of the condemned
property. Id.  An appraisal method is valid if it produces
an amount that a willing buyer would actually pay to a willing seller. Id.








The record shows that Home and Hearth=s hotel was situated in a unique
location.  The property is flanked by two
major traffic arteries, U.S. Highways 90-A and 59, which pass through Sugar Land.  Due to a planned construction change to the
interchange of the two highways, Home and Hearth would have direct access to
both highways, and the property was the only improved property in the
area.  The hotel was completed during the
second quarter of 1999, while the date of the taking was January 2000.  Although the cost approach generally is less
accurate the older a property is, here, less than one year passed between the
completion of construction and the date of the taking. Id.  The record
shows that the property was unique in character and not frequently exchanged in
the market place.  The cost approach was,
therefore, a proper barometer for assessing market value of the tract before
the taking.  Because the evidence
revealed that the cost approach was an acceptable method of establishing market
value before the taking in this case, the trial court did not err in its role
as gatekeeper when it admitted this testimony.         

Deal also testified that the hotel property had
suffered a 10% reduction in value brought about by the taking of the fee
area.  If the City had not taken the fee
area, Home and Hearth could have built a fast-food restaurant or a restaurant
on the fee area.  A restaurant located on
the fee area would enhance the value of the hotel property.  Deal testified that the 10% reduction in
value of the hotel property amounted to $508,722 and that the total diminution
in value to the remainder tract attributable to the taking of the fee area was
$1,037,802.[7]

Schulz, the City=s
expert, testified that there was no damage to the remainder property.  He determined that the value of the 3.1603
acres of land underlying the hotel would be $8 per square foot.  That would total approximately $1,095,000 for
the land underlying the hotel.  Although
Schulz did not believe that the value of the hotel on the remainder tract
should be considered, he did testify that, if the value of the underlying land
is added to the value of the hotel property, the total would be
$5,090,000.  This amount is $22 more than
Deal testified to under the cost approach. 

Deal=s
testimony on the market value of the remainder before and after the taking was
admissible.  The trial court did not err
in admitting it.

The City=s
Posttrial Motions

The City further challenges the trial court=s rulings on its motion to disregard
the jury=s answers
regarding the fee area and the remainder tract and its failure to grant a
judgment notwithstanding the verdict. 
Its complaint is essentially that, because Henry=s
testimony and Deal=s
testimony was not admissible, there is no evidence to support the verdict of
the jury on those issues. 








An appellate court reviews a ruling on a motion
for judgment notwithstanding the verdict under a legal sufficiency or Ano-evidence@
standard of review.   We will review only
the evidence tending to support the jury verdict and disregard all evidence to
the contrary.  Sherman v. First Nat'l Bank in Center, Tex., 760 S.W.2d 240, 242 (Tex. 1988). 
We will uphold a jury verdict if more than a scintilla of evidence
supports the jury finding.  Garcia v.
Ins. Co. of State of Pa., 751 S.W.2d 857,
858 (Tex.
1988). 

We have held that the evidence with respect to the
fee area and to the remainder is admissible. Therefore, there is some evidence,
more than a scintilla, to support the verdict of the jury.  The City=s
issues regarding its postjudgment motions regarding the remainder tract are
overruled. 

Jury Charge Complaints

In their last two issues, the City asserts that
the trial court abused its discretion in excluding two requested jury
instructions.  At the original charge
conference, both parties objected to the court=s
charge.  Home and Hearth=s objections were overruled.  The trial court sustained the City=s objection to an instruction by the
trial court and overruled the City=s
request to include two other instructions. 
The trial court prepared an amended charge and again asked for
objections.  Home and Hearth had no
objections, and the City asserted only an objection to the jury considering
cost-to-cure damages:

THE
COURT:  The Court [has] prepared an
amended charge for the jury. We=re
here to entertain objections on behalf of the Defendant?

 

[DEFENDANT=S COUNSEL]:  Okay. We have no objections to the Court=s charge. 

 

THE
COURT: On behalf of the Plaintiff?

 

[PLAINTIFF=S COUNSEL]:  Your Honor, our objection was stated at the
conclusion that we believe that the jury should be instructed not to consider
the cost of cure damages for the reasons we previously stated.

 

THE
COURT: All right. That=s
overruled.

 








Home and Hearth asserts that the City waived any
complaint directed at the jury instructions because the City did not re-urge
their objections and re-tender substantially correct instructions after the
trial court amended its charge.  The
objection finally made to the trial court by the City was not the objection
previously made.  After the charge had
been amended, the City=s
objection was, A[W]e
believe that the jury should be instructed not to consider the cost of cure
damages.@  The instructions previously tendered to the
trial court did not address cost to cure. 
The issues on appeal do not comport with the final objection made to the
trial court, and the issues are waived.  Tex. R. Civ. P. 274, 278; Tex. R. App. P. 33.1(a).

Even if we were to hold that the issues were not
waived, we hold that the trial court did not abuse its discretion when it
refused to include the City=s
two proposed instructions.  The trial
court has considerable discretion in deciding what instructions are necessary
and proper in submitting issues to the jury. 
In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000). 
The trial court has considerable discretion in determining necessary and
proper jury instructions. Id.
When a trial court Arefuses
to submit a requested instruction, the question on appeal is whether the
request was reasonably necessary to enable the jury to render a proper verdict.@ Tex.
Workers= Comp.
Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000).  
A trial court abuses its discretion by acting arbitrarily, unreasonably,
or without consideration of guiding principles. Walker
v. Gutierrez, 111 S.W.3d 56, 62 (Tex.
2003).  The City complains that the trial
court abused its discretion in not allowing the following instruction:

You are further instructed that in determining the
fair market value of the Fee Area and the Easement, you shall determine such
value based on the condition of Defendant=s
property as of January 13, 2000Ctaking
into account all relevant factors that affect its valuation, including the
market for its possible future use. 

 

The City urges that Deal, during his testimony,
did not consider limitations on the development of the fee area and that the
trial court=s failure
to instruct Aopened
the door for the jury to base its determination on speculative uses for which a
portion of the Fee Area was not available as of January 13, 2000.@ 
The City further argues that, by allowing the jury to consider the
definition of the highest and best use in the charge and not the above
instruction, the trial court Aessentially
foreclosed reliance on Mr. Schulz=s
testimony in answering Question Nos. 1 and 3. 
The jury was left with only testimony of Mr. Deal on which to base its
verdict.@ 

A review of the entire record shows that it was
clear during trial, in the instructions, and in questions actually submitted to
the jury that the date of valuation of the fee area was January 13, 2000, and
that the proper consideration in determining fair market value of the fee area
being taken was January 13, 2000.  In
connection with its definition of market value, the trial court instructed the
jury as follows:








[W]ith
both seller and buyer taking into consideration all the uses both for which the
property is reasonably adaptable and for which the property in all reasonable
probability will become available within the reasonable future.  In making your determination of market value,
you will consider the highest and best use of the land involved.

 

The trial court properly instructed the jury on
market value.  The instruction given is
almost identical to the instruction approved in Cannizzo, 267 S.W.2d at
815.  Further, the trial court correctly
instructed the jury to consider the highest and best use of the property.  As we have stated, that is an accepted tenet
in arriving at market value.  See Appraisal Institute, The Appraisal Of Real
Estate 269 (9th ed. 1987).  The
trial court did not abuse its discretion when it excluded this instruction.

The City also appeals the trial court=s refusal of an instruction that
defines the fee area, the purpose of the fee area and easement acquisitions,
the current and future drainage rights of Home and Hearth, and the details of
mineral and dedication rights of Home and Hearth.  Apart from the details of mineral and
dedication rights, all of this information was in the record.  Such information is evidentiary in
nature.  We cannot conclude and the City
did not show, given the trial court=s
considerable discretion, that this instruction was reasonably necessary to
enable the jury to render a proper verdict under the record in this case.

Even if we were to hold that the City did not
waive its complaint regarding its requested instructions, the trial court did
not abuse its discretion in refusing them because the instructions were not Areasonably necessary to enable the jury
to render a proper verdict.@  Mandlbauer, 34 S.W.3d at 912.  We overrule all of the City=s issues.

This Court=s Holding

The judgment of the trial
court is affirmed.  

 

JIM R. WRIGHT

CHIEF JUSTICE

 

January 18, 2007

Panel consists of:  Wright,
C.J., 

McCall, J., and Strange, J.

                                                                                


 

                                                                                     
APPENDIX A

 











 
 
 
 
 




 

                                                                                                











     [1]ASugar Land,@ the city, is comprised of two words, while Home and
Hearth=s registered name uses ASugarland.@  





     [2]See
diagram in Appendix A. 





     [3]One
acre is equivalent to 43,560 square feet. Merriam-Webster=s Collegiate Dictionary 11 (11th ed. 2003).





     [4]Home
and Hearth asserts that, because the City did not object at trial to Deal=s testimony about the highest and best use and to the
court=s submission of Question No. 1, the City waived its
complaint as to the reliability of Deal=s opinion
on the highest and best use.  The City,
however, filed a pretrial motion to exclude. 
Kraft, 77 S.W.3d at 807 (ATo
preserve a complaint that an expert=s
testimony is unreliable, a party must object to the testimony before trial or
when it is offered.@).





     [5]The
dimensions of the regional detention pond were to be approximately 400 feet
long, 130 feet wide, 19 feet deep, with a 5.9- foot static water level at all
times and side slopes at a 3-to-1 ratio.





     [6]In
its brief, the City makes references to various defects in qualifications and
opinions pertaining to Henry.  Many of
those references are to the clerk=s record
only and not to the reporter=s record.  We are
not required to search the reporter=s record
to determine whether the clerk=s record references were also made a part of the
reporter=s record of evidence actually presented to the trial
court or to the jury.   See Tex.
R. App. P. 38.1(h).  





     [7]In
its brief, as with Henry=s testimony, the City makes references to various
opinions by Deal.  Many of those
references are to the clerk=s record only and not to the reporter=s record.  We are
not required to search the reporter=s record to
determine whether the clerk=s record references were also made a part of the
reporter=s record of evidence actually presented to the trial
court or to the jury.  See Rule
38.1(h).