**Reversed and Remanded and Majority Opinion filed March 31, 2022.**



In The

# Fourteenth Court of Appeals

## NO. 14-20-00206-CV

### THE STATE OF TEXAS, Appellant

### V.

### AUDIE GRAY FAMILY L.P., A TEXAS LIMITED PARTNERSHIP, Appellee

**On Appeal from the County Court at Law No. 1**
**Fort Bend County, Texas**
**Trial Court Cause No. 18-CCV-061400**

## M A J O R I T Y   O P I N I O N

In this condemnation case, the State appeals from the trial court's judgment in favor of the landowner asserting that the trial court erred in denying two motions by the State to exclude evidence. Concluding that the trial court reversibly erred in denying one of these motions to the extent the State sought the exclusion of testimony under the Property Owner Rule as to two valuation approaches, we reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 2015 appellee/defendant Audie Gray Family L.P., a Texas Limited Partnership ("Audie") purchased 20.1586 acres of agricultural land in Fort Bend County outside the boundaries of any municipality, with frontage on State Highway 36 ("Parent Tract"). Audie paid $275,000 to buy the land, or approximately $13,642 per acre. Greg Carlson, one of the partners in Audie, testified that Audie bought this land intending to build a boat and recreational vehicle storage facility on the Parent Tract. Carlson testified that Audie developed part of the property into a boat and recreational vehicle storage facility (the "Storage Facility"). According to Carlson, when Audie bought the Parent Tract, Carlson noticed that the plat showed a right of way for the Texas Department of Transportation on part of the property adjacent to State Highway 36. Audie did not put any structure on the part of the property that was in the right of way because of the risk that this part of the property might be condemned in the future. Audie put a gravel road on this part of the property connecting the Storage Facility with State Highway 36. Audie also had electrical connections installed but did not connect the property to any public water or wastewater system.

The State of Texas initiated a proceeding in the trial court seeking to condemn a 1.8923-acre (82,427 square feet) parcel from the Parent Tract (the "Property"), leaving a remaining property of 18.2663 acres still owned by Audie (the "Remainder"). Evidence in the record shows that before the State acquired the Property through condemnation, Audie installed two small billboards on the Property.[1] Carlson was told that he would receive sixty days' notice before the State removed the billboards, so that Audie would have an opportunity to remove

---

[1] One billboard advertised the Storage Facility, and the other billboard advertised the business of a company unrelated to today's case, in which Carlson was one of two owners.

them. Instead, Carlson testified that the billboards were removed and disposed of without notice. The record shows that the Property is a strip of land that borders State Highway 36 and that in most places is 120 feet wide. In this photograph that was admitted in evidence at trial, the Property is outlined in red, and the Parent Tract is outlined in blue:



At the time of the condemnation, TFG Associates LLC was conducting a boat and recreational vehicle storage business using the name "Texas 36 Storage" on the Remainder, and Audie was renting about one-half of an acre of the Property and part of the Remainder to a farmer for agricultural use.

After the State filed its petition seeking condemnation of the Property, the trial court appointed special commissioners who conducted a hearing and assessed damages of $118,127 under section 21.042 of the Texas Property Code. To take possession of the Property, the State deposited this amount with the trial court on August 20, 2018 (the "Acquisition Date"). At Audie's request, the trial court ordered that the deposited funds be disbursed to Audie. Both the State and Audie objected to the special commissioners' findings, triggering a trial de novo in the trial court.

The State retained Michael Miggins as its expert witness. Audie did not retain an expert witness but rather relied on Carlson to testify under the Property Owner Rule[2] as to the amount of compensation that should be awarded to Audie. Before trial the State filed a motion to exclude Carlson's testimony related to his opinions regarding the value of the Property, asserting various arguments as to why the trial court should exclude this testimony (the "Motion"). The trial court denied the Motion on November 14, 2019, at the pretrial conference held shortly before trial began. The trial court also granted in part and denied in part another motion filed by the State, entitled "State's Motion to Exclude Evidence & Strike Expert Designation" (the "Second Motion").[3]

At trial Carlson testified that based on his "income approach" to valuing the Property, fair compensation for Audie would be $406,800. Carlson also testified that based on his "sales comparison approach" to valuing the Property, fair compensation for Audie would be $371,708. When Audie offered documentary evidence summarizing Carlson's opinions regarding his income approach and sales comparison approach, the State objected to these exhibits on the same grounds asserted in the Motion. The trial court overruled the State's objections. Miggins testified that the total compensation to Audie should be $61,748.

The jury found that the total compensation due to Audie as a result of the State's acquisition of the Property is $236,700. The trial court rendered judgment on the jury's verdict. The State filed a motion for new trial and a motion for judgment notwithstanding the verdict. The trial court denied both motions, and the State timely perfected this appeal.

---

[2] *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012).

[3] The trial court's rulings on these motions in open court were memorialized in a written order that the trial court signed on November 20, 2019.

## II. ISSUES AND ANALYSIS

On appeal, the State asserts in its first issue that the trial court erred in denying the Motion and the Second Motion. It its second issue the State asserts that the evidence is legally and factually insufficient to support the jury's finding as to the amount of compensation due to Audie.

Both the United States and Texas Constitutions require governments to compensate landowners for takings of their property for public use. U.S. Const. amend. V (requiring "just compensation"); Tex. Const. art. I, §17 (requiring "adequate compensation"). When a governmental entity condemns real property, the normal measure of damages is the land's market value. *See* Tex. Prop. Code Ann §21.042(b) (West, Westlaw through 2021 C.S.).; *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Thus, the central damage issue in the typical condemnation case is how to measure the market value of the condemned property. *See Estate of Sharboneau*, 48 S.W.3d at 182.

Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Id*. (quoting *State v. Carpenter*, 89 S.W.2d 979, 980 (Tex. 1936)) (internal quotations omitted). The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method. *Estate of Sharboneau*, 48 S.W.3d at 182. Courts have long favored the comparable sales approach when determining the market value of real property. *Id*. If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market. *Id*. Under a comparable sales analysis, data for sales of similar property are found, then an upward or downward adjustment is made to these sales prices based on differences in the subject

property. *Id*. Comparable sales must be voluntary, and should take place near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics. *Id*. Comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity. *Id*. But if the comparison is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences, a court should refuse to admit the sale as comparable. *Id*.

Where, as in today's case, only part of a tract is condemned, the proper measure for determining compensation is the market value of the land actually appropriated plus the difference, if any, in the market value of the remainder immediately before and immediately after the taking. *See Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002). Because Audie has not contended that the condemnation caused any decrease in the market value of the Remainder, only the market value of the Property is at issue in this case.

The jury may consider the highest and best use to which the Property taken can be adapted. *See id.* at 628. The existing use of the Property is its presumed highest and best use, but Audie may rebut this presumption by showing a reasonable probability that when the taking occurred, the Property was adaptable and needed or would likely be needed in the near future for another use. *See id*.

Texas law permits Audie to introduce testimony that the Property is a self-sufficient separate economic unit, independent from the Remainder, with a different highest and best use and different value from the Remainder. *See id.* In this situation, the market value of the Property may be determined without reference to the Remainder. *See id.* But if the Property cannot be considered as a separate economic unit, the Property's market value must be determined by

6

evaluating the Property as a proportionate part of a larger economic unit including all or part of the Parent Tract. *See id.*

The Property Owner Rule establishes that an owner is qualified to testify to the value of the owner's property; nonetheless, the Supreme Court of Texas requires that such testimony meet the "same requirements as any other opinion evidence." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (quoting *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)) (internal quotations omitted). A property owner's testimony must be based on the market value of the property, not the value of the property to the owner, the intrinsic value, or some speculative value of the property. *See Justiss*, 397 S.W.3d at 155, 158, 161

The Property Owner Rule falls under Texas Rule of Evidence 701, which allows a lay witness to provide opinion testimony if it is (a) rationally based on the witness's perception and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. *See* Tex. R. Evid. 701; *Justiss*, 397 S.W.3d at 157. Based on the presumption that an owner is familiar with the owner's property and its value, the Property Owner Rule is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on land values. *See Justiss*, 397 S.W.3d at 157. Under the rule, an owner's valuation testimony fulfills the same role as expert testimony. *See id.*

Because property-owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards. *See id.* at 159. Thus, as with expert testimony, an owner's property valuation may not be based solely on the owner's *ipse dixit.* *See id.* An owner may not simply echo the phrase "market value" and state a number to substantiate the owner's claim; the property owner must provide the factual basis on which the owner's opinion rests. *See id.* This burden is not onerous, particularly in light of the resources available today. *See id.* But, the valuation must be substantiated; a naked assertion of "market value" is not

7

sufficient. *See id*. A property owner's testimony must be based on the legal definition of market value. *See id*. at 158, 161. An owner's qualification to testify does not allow the property owner to substitute a "value to me" standard for the governing legal standard of "market value." *See id*. at 158, 161. Even if unchallenged, the property owner's testimony must support the verdict, and conclusory or speculative statements do not. *See id*. Testimony is speculative if it is based on conjecture or guesswork. *See id*. at 156.

Corporate entities, such as limited partnerships, are treated "the same as natural persons for purposes of the Property Owner Rule, with certain restrictions on whose testimony can be considered as that of the property owner." *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 849 (Tex. 2011). A two-pronged test governs the inquiry into whether a witness properly can testify under the Property Owner Rule on behalf of an entity other than a natural person. First, "[T]he Property Owner Rule is limited to those witnesses who are officers of the entity in managerial positions with duties related to the property, or employees of the entity with substantially equivalent positions and duties." *Id.* Second, "[T]he Property Owner Rule falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value, but the Property Owner Rule creates a presumption as to both." *Id.* The evidence does not show that Carlson is an officer of Audie in a managerial position or an employee of Audie. The evidence does not show who is the general partner of Audie or whether Carlson is an officer or employee of Audie's general partner.[4] On appeal, the State does not argue that Carlson has failed to satisfy this two-

---

[4] Carlson testified at his deposition that he was one of two "partners" in Audie, and one of two "partners" in TFG Associates LLC, an entity created to develop the Storage Facility. Presumably, this means that Carlson is one of two limited partners in Audie, and one of two members in TFG Associates LLC.

8

pronged test; therefore, we presume, without deciding, that Carlson satisfies this test.

On appeal, the State contends that the trial court abused its discretion in denying the Motion and admitting evidence regarding Carlson's two approaches to valuing the Property and his calculation of how much compensation Carlson thinks Audie is due based on the condemnation of the Property. We review the trial court's decision in this regard for an abuse of discretion. *See Zwahr*, 88 S.W.3d at 629. The trial court abuses its discretion if it acts without reference to guiding rules or principles, or in an arbitrary or unreasonable manner. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985).

**A. Did the trial court abuse its discretion in denying the part of the Motion in which the State asked the trial court to exclude Carlson's testimony regarding his income approach to valuing the Property?**

The State contends that the trial court abused its discretion in denying the Motion as to Carlson's testimony regarding his income approach to valuing the Property because the income approach considers business income and consideration of busines income is permitted only in the two situations described in *State v. Central Expressway Sign Associates*. *See* 302 S.W.3d 866, 871 (Tex. 2009). The State also argues that the trial court abused its discretion because (1) an income approach to valuing the Property is not proper given that the Property never generated income based on the storage of vehicles—the type of income used in Carlson's approach; and (2) to generate storage income on the Property would require improvements to the Property that have not been constructed.

In *Central Expressway*, the Supreme Court of Texas concluded that Texas law allows income from a business operated on the property to be considered in a condemnation proceeding in two situations: (1) when the taking, damaging, or

destruction of property causes a material and substantial interference with access to one's property; and (2) when only a part of the land has been taken, so that lost profits may demonstrate the effect on the market value of the remaining land and improvements. *See id*. Absent one of these two situations, income from a business operated on the property should not be the basis for a condemnation award. *See id*. Courts have applied this rule for two reasons: first, because profits from a business are speculative and often depend more upon the capital invested, general market conditions, and the business skill of the person conducting it than it does on the business's location; and second, because only the real estate and not the business has been taken and the owner can presumably continue to operate the business at another location. *See id*. In the Motion, the State asserted that neither of the two situations mentioned in the *Central Expressway* case applies to today's case and asked the trial court to exclude Carlson's testimony regarding his income approach. The trial court denied the Motion. Thus, the State preserved error. *See* Tex. R. Evid. 103(a); *Austin v. Weems*, 337 S.W.3d 415, 421–22 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Even after the condemnation in today's case the Remainder may still be accessed using State Highway 36, and Audie does not contend that the taking, damaging, or destruction of property has caused a material and substantial interference with access to Audie's property. Thus, the first scenario from the *Central Expressway* case does not apply. *See Central Expressway Sign Associates*, 302 S.W.3d at 871.

The State attached to the Motion Audie's responses to the State's request for disclosure showing the calculations under the income approach. The State also attached Carlson's testimony at his deposition, in which Carlson testified as follows:

- As of the Acquisition Date, TFG Associates LLC was operating a business on the Property using the name "Texas 36 Storage." In this business, TFG Associates stores boats, recreational vehicles, tractors, and other vehicles at the Storage Facility on the Remainder.

- Carlson and his nephew, Audie Gray, are "50 percent partners" in TFC Associates.

- After TFG Associates improved the land and constructed the Storage Facility, TFG Associates started storing some vehicles on the land in November 2016.[5]

- When Audie bought the Parent Tract, the Property was in a "proposed right of way for Highway 36," and TFG Associates's engineer said it was best not to build anything on the Property. So, TFG Associates put two billboards on the Property as well as driveway connecting the Storage Facility with Highway 36.

- Carlson calculated the value of the Property under the income approach by calculating what TFG Associates's net operating income would be if it used 42,000 square feet of the Property as parking spaces for stored vehicles and then applying a seven percent capitalization rate to the net operating income.

- Carlson calculated the "net operating income" based on TFG Associates's "current setup," and Carlson "took those numbers and extrapolated them out to come up with the price per square foot of the land that [TFG Associates is] generating income off of." The numbers that Carlson used in this calculation are TFG Associates's rental income and its operating cost. Carlson subtracted the operating cost from the rental income to calculate the amount that TFG Associates was "netting" from each square foot of its parking space, and Carlson then multiplied this amount by 42,000 square feet of the Property that he thinks TFG Associates could have used as parking spaces.

---

[5] At his deposition, Carlson testified that TFG Associates was created "to develop the storage property" and that TFG Associates owns the storage business. Carlson also stated that he is one of two "partners" in TFG Associates. In testifying at his deposition regarding the storage business, Carlson often spoke in the first person regarding the storage busines. In this context, we construe these statements by Carlson to refer to TFG Associates rather than to Carlson in his personal capacity.

- Carlson stated that the gross revenue per square foot of parking space would be thirteen cents. Carlson projected what he thinks the net operating income would be from 42,000 square feet of parking spaces on the Property and then applied a seven percent capitalization rate to this amount.

- In August 2018, the occupancy rate of the Storage Facility was between fifty-six and fifty-eight percent. TFG Associates can develop for a storage use any of the surplus vacant land in the Remainder, except that the county requires detention ponds in the back of the Remainder.

- Before the State acquired the Property, about half of the Property was rented out to a farmer for raising crops. The farmer paid rent of $50 per acre per year. Before the State acquired the Property, TFG Associates was not using the Property to park vehicles for storage.

- Carlson stated that the Remainder currently has a developed and an undeveloped part and that Carlson plans to develop more boat and recreational vehicle storage on the Remainder.

- Carlson stated that but for the condemnation of the Property he would have put a parking lot on the Property "that would have been part of the entire storage system."

Though only part of the Parent Tract has been taken, Audie did not contend in the trial court that the condemnation caused any decrease in the market value of the Remainder and its improvements. However, on appeal, Audie indicates that the second scenario from the *Central Expressway* case applies to this case. Audie argues that Carlson valued the front portion of the Parent Tract as a separate economic unit and that this portion was developed and operated as a separate economic unit on the Acquisition Date. Audie then cites trial testimony from Carlson in which he testifies that because of the State's project, TFG Associates did not develop part of the Property. Audie then states that Carlson testified that "this deprived him of future rental space on the remainder of the parcel." Though Audie uses the word "remainder," the land to which Audie refers in this part of its appellate brief is part of the Property, not part of the Remainder. Even under a liberal construction, we do not construe Audie as arguing in its brief that the

12

State's acquisition of the Property affected the market value of the Remainder and the improvements thereon. In any event, even if Audie had asserted in its appellate brief that the State's acquisition of the Property caused a decrease in the market value of the Remainder and the improvements thereon, this argument would have come too late. Audie did not make any such argument in its response in opposition to the Motion. During the hearing at which the trial court denied the Motion, Audie's counsel stated that "we're not claiming damage to the remainder because of the project." At trial Audie's counsel again said that Audie was not asking for damages to the Remainder, and Carlson testified that he was not claiming any damages to the Remainder. We conclude that the second scenario from the *Central Expressway* case does not apply. *See id.*

Because neither scenario from the *Central Expressway* case applies, Texas law does not allow income from TFG Associates's storage business to be considered in determining the value of the Property in this condemnation proceeding. *See id*. After considering the record under the applicable standard of review, we conclude that the trial court abused its discretion in denying the Motion to the extent the State sought the exclusion of Carlson's testimony as to his income approach.[6] *See id*.

**B. Did the trial court abuse its discretion in denying the part of the Motion in which the State asked the trial court to exclude Carlson's testimony regarding his sales comparison approach to valuing the Property?**

The State contends that the trial court abused its discretion in denying the Motion as to Carlson's testimony regarding his sales comparison approach[7] to valuing the Property because, among other things, Carlson based his opinion on

---

[6] We need not and do not address the State's other arguments as to why the trial court abused its discretion with respect to the income approach

[7] In this approach Carlson attempted to employ a comparable sales method to value the Property.

value under this approach on his personal preferences rather than on market preferences in violation of the Supreme Court of Texas's holding in *Justiss*. *See Justiss*, 397 S.W.3d at 155, 158, 161. In the Motion, the State complained that contrary to *Justiss*, Carlson made adjustments to his purported comparable sales based on an improper "value to user perspective." The State objected that rather than using the willing buyer/willing seller standard mandated by Texas law, Carlson justified his sales comparison approach to valuing the Property based on a "particular user" standard. The trial court denied the Motion. Thus, the State preserved error. *See* Tex. R. Evid. 103(a); *Austin*, 337 S.W.3d at 421–22.

The State attached to the Motion Audie's responses to the State's request for disclosure showing Audie's calculations under the sales comparison approach. The State attached documents regarding various sales that Carlson considered as potentially comparable sales. The State also attached Carlson's testimony at his deposition, in which Carlson testified as follows:

- As of the Acquisition Date, the Property had electricity and internet but no water or wastewater service.

- Under his sales comparison approach, Carlson valued the Property at $4 per square foot. Carlson agrees that in July 2015 Audie purchased the Property, as part of the Parent Tract, for $0.32 per square foot.

- Carlson agrees that smaller properties generally sell for a higher price than larger properties.

- One of the comparable sales on which Carlson relied in his sales comparison approach was a 1.5-acre parcel bordering Highway 36 that was sold as vacant land and then a "Dollar General" store was built on it.

- Carlson considers this property inferior to the Parent Tract because the parcel only has 1.5 acres while the Parent Tract has 20 acres. Because the Parent Tract has 20 acres, "I have got room to expand. Depends upon the commercial use of it. . . [W]hen you look at this [1.5-acre] raw piece of land, if I want to build a boat and RV storage on this, I wouldn't touch it. If I want to build on 20 acres, that's a good deal. It's worth more to me as a boat and

14

RV storage. You have to look at everything from my perspective. I am looking at boat and RV storage. I need land. When I look at this property and compare it to mine, mine is worth more because I can't build a boat and RV storage there."

- Carlson testified that the 1.5-acre parcel is smaller than the Parent Tract and that "I wouldn't build a boat and RV [sic] there . . . I am looking at the size saying it doesn't really factor into what I would buy the property for, what it's worth to me."

- Carlson also stated that as to one comparable sale, he did not adjust for the fact that water and wastewater utilities are available on that property but not on the Property because Carlson does not see a distinction between well water and septic versus water and wastewater. Carlson stated that this was "a personal preference" and that an appraiser probably would account for this difference. When asked whether a willing buyer would account for this difference, Carlson said, "That's again a personal preference. It depends. If somebody thinks like I do, they are going to not care."

- Carlson indicated that he did not adjust any of the comparable sales based on the fact that the Property does not have sewer and wastewater but the property in the comparable sale does have sewer and wastewater. According to Carlson, he did not need to do so because "I can put in sewer and wastewater or I can put in — in my case it would be septic. I would have to put in a septic system and water relatively for the same price that they put theirs in."

- Carlson indicated that although he would pay more for a property that did not have water and wastewater, other people generally would not do so. Carlson indicated that he was answering the question, "What is the property worth to me?"

- When asked whether he understood that he is appraising the Property from the perspective of a willing buyer, not necessarily Carlson specifically, Carlson responded, "Right. But me being the buyer, I have to appraise the property as the buyer. I just have to do that. . . I have got to be fair, because I am not looking at selling it to somebody else, and . . . telling the willing buyer that here is what the land is worth — other than the State, it's worth it to me; it's $4 a square foot. That's what it's worth to me."

- Carlson stated that the Property is worth four dollars per square foot "to put a boat and RV storage there."

Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Estate of Sharboneau*, 48 S.W.3d at 182 (quoting *Carpenter*, 89 S.W.2d at 980) (internal quotations omitted). Because property-owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards. *See Justiss*, 397 S.W.3d at 159. A property owner's testimony must be based on the legal definition of "market value," not on the value of the property to the owner. *See id.* at 155, 158, 161. A property owner's qualification to testify does not allow the property owner to substitute a "value to me" standard for the governing legal standard of "market value." *See id*. The evidence attached to the Motion showed that Carlson employed a "value to me" standard in considering the comparable sales used in his sales comparison approach. After considering the record under the applicable standard of review, we conclude that the trial court abused its discretion in denying the Motion to the extent the State sought the exclusion of Carlson's testimony as to his sales comparison approach.[8] *See id*.

**C.     Did the trial court's evidentiary errors probably cause the rendition of an improper judgment?**

We next address whether the trial court's erroneous evidentiary rulings warrant the reversal of the trial court's judgment. Reversal of the trial court's judgment based on the trial court's erroneous admission of evidence is warranted only if the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1; *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012). The Supreme Court of Texas has concluded that it is not possible to

---

[8] We need not and do not address the State's other arguments as to why the trial court abused its discretion in this regard.

prescribe a specific test for harmless-error review. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 136. In conducting a harm analysis, courts must evaluate the entire case from voir dire to closing argument, considering the evidence as a whole, the strength or weakness of the case, and the verdict. *Id*. In determining whether the erroneous admission of evidence probably led to an improper judgment, courts look to the role the evidence played in the context of the trial and the efforts made by counsel to emphasize the erroneous evidence, as well as whether contrary evidence existed that the improperly admitted evidence was calculated to overcome. *Id*.

As to Carlson's income approach, Carlson testified at trial to the same income approach to valuing the Property as the income approach addressed at his deposition, though he made one change in the calculation under this approach at trial. The evidence at trial regarding Carlson's income approach reflected a substantially similar methodology and method of calculation to the income approach shown by the evidence attached to the Motion. As to Carlson's sales comparison approach, Carlson testified at trial as to this approach to valuing the Property, and Carlson's calculations under this approach were the same as at the time of Carlson's deposition. At closing argument Audie's counsel discussed the income approach and the sales comparison approach and argued that the jury should award the amount found by Carlson under either of these approaches. The only issue before the jury was the amount of compensation to be awarded to Audie as a result of the State's acquisition of the Property. The jury found this amount to be $236,700, an amount close to $234,274—the midpoint between the amount sought by Audie under the income approach ($406,800) and the amount for which the State advocated ($61,748). The amount of compensation found by the jury is significantly higher than the amount for which the State advocated but lower than

17

the amounts yielded under Carlson's income approach and sales comparison approach. The trial court rendered judgment on the jury's verdict. Under the legal standard applicable to this harm analysis, we conclude that the trial court's error in denying the Motion to the extent the State sought the exclusion of Carlson's testimony as to his income approach probably caused the rendition of an improper judgment. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 136. Under the same standard, we conclude that the trial court's error in denying the Motion to the extent the State sought the exclusion of Carlson's testimony as to his sales comparison approach probably caused the rendition of an improper judgment. *See id*.

### III. CONCLUSION

For the reasons stated above, the trial court abused its discretion in denying the Motion to the extent the State sought the exclusion of Carlson's testimony as to his income approach and as to his sales comparison approach. To this extent, we sustain the State's first issue. The remainder of the first issue and the second issue would not entitle the State to greater relief on appeal. Therefore, we need not and do not address the remainder of the first issue or the second issue. We reverse the trial court's judgment and remand the case to the trial court for a new trial and further proceedings consistent with this opinion.


/s/  Randy Wilson
     Justice


Panel consists of Justices Jewell, Spain, and Wilson (Spain, J., concurring without opinion).

18